CLERK'S OFFICE U.S. DIST COURT
AT LYNCHBURG, VA
FILED
for Charlottesville
MAY 2 6 2006
JOHN F. CORCORAN, CLERK
BY: Fay Coleman
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL CASE NO. 3:06-CR-00011 |
| v. | OPINION AND ORDER |
| JONATHAN LEONARD DEAN, | |
| Defendant. | JUDGE NORMAN K. MOON |

This matter comes before the Court on Defendant Jonathan Dean's motion to suppress, filed April 10, 2006, and memorandum of law in support thereof, filed May 23, 2006. A hearing on the motion was held on May 25, 2006.

## I. FACTS

On November 5, 2005, at approximately 11:30 pm, a neighbor of Defendant returning to her apartment noticed a strong odor of gasoline in the common hallway of the apartment building in which she resides. The apartment building is a three-story wooden structure containing twelve apartment units, and her apartment is across from Defendant's on the bottom floor, part of which is below ground. She contacted the resident manager, who called the Albemarle County Police Department ("ACPD").

Sargent James Larkin responded and arrived on the scene, and at some point in transit or after arriving called the Albemarle County Fire Marshals. Fire Investigator James Barber arrived around midnight, along with other two other members of the fire department. Barber smelled a strong odor of gasoline in the common-area hallway, which seemed to emanate from Defendant's

1

apartment. Barber went outside and saw a red two- to three-gallon gasoline container with its top off through a window into Defendant's apartment. The window was open several inches, but it was covered entirely by a screen. Barber admitted that he could have entered Defendant's apartment through the window, which was not far off the ground, by opening it and popping out the screen. He testified, however, that it was not his custom to enter homes through windows, and doing so created a risk of assault by persons within who could reasonably confuse him with a burglar. Barber also saw through the window a drop cord in the room, a lit lamp, a box of $CO_2$ cartridges, and a box with what appeared to be scorch markings. Because of his training in explosives and incendiary devices, he knew that gas fumes are heavier than air and would be more concentrated near the floor, where electrical outlets are usually found. The drop cord caused him particular concern that if an igniting agent was introduced into the mixture, an explosion could occur.

Barber returned into the apartment building and proceeded to knock on Defendant's door. No one responded. He called the resident manager and requested a key to Defendant's apartment. While waiting for the manager to arrive, he went back out to his truck and obtained his camera. The manager arrived with the key, and before using it, Barber knocked again—again without response. He never attempted to obtain Defendant's phone number or to call the apartment. He estimated that about twenty minutes elapsed between the time he first looked through Defendant's window and when he entered Defendant's apartment.

Once inside, the first action of Barber or another member of the fire department was to use a meter to measure the concentration of gas fumes in the apartment. The reading assured Barber that it would be unnecessary to evacuate the apartment building. As he proceeded

through the apartment to retrieve the gas container, he looked to his right into a kitchen and saw three two-liter plastic bottles that appeared to have initiation wires sticking out of their sides. Barber also noted bottle caps on top of the microwave that appeared to have been modified with tire pressure valves, a number of small propane tanks, various wires, and batteries. He took numerous photographs of these objects, but less than 24 total. Within a minute or two of seeing these items, he proceeded down the hall to the back bedroom, where he observed a flashlight plugged into a wall outlet as well as the same objects he had seen through the open window. He opened the window further to increase ventilation and removed the gas container from the apartment complex. He did not unplug the flashlight, and testified that removal of the gas container eliminated the source of what he had been concerned was an "imminent" risk. Barber directed his colleagues to further ventilate the apartment.

Based on his training, Barber was concerned that the items in the kitchen were components that if assembled could form a destructive device. Barber specifically testified that his concern while still outside the apartment was that the gasoline fumes could cause an explosion, but when inside, after measurement of the fume levels and removal of the gas container, his concern shifted to the potential explosive device components he saw in the kitchen in plain view.

Barber radioed Sgt. Larkin and informed him that he had concern about possible illegal activity of the apartment's occupant, that he planned to obtain a search warrant, and asked Larkin to find the occupant and detain him. Larkin found Defendant inside a pick-up truck with two other persons in another apartment building a couple buildings down within the same apartment complex. Larkin identified himself and asked Defendant whether he was Jonathan Dean, who

3

admitted he was. Larkin detained and handcuffed Defendant, and advised him of his Miranda rights. Barber arrived on the scene and saw Dean in handcuffs, and left soon thereafter to seek a warrant.

At 2:00 am on November 6, 2005, Barber obtained a warrant authorizing the search of Defendant's apartment and seizure of destructive device components. During the first search, search team members saw within plain view papers near a computer in the living room explaining how to manufacture a silencer. Later that morning, the Barber obtained a second warrant authorizing seizure of the computer and a search for evidence of receipt of information about manufacturing explosive devices via the internet.

## II. DISCUSSION

Defendant claims that nearly all of the evidence in this case must be suppressed because the warrantless entry into his apartment was unlawful and not justified under the "emergency doctrine," and that all subsequently obtained evidence is poisonous fruit of this initial unlawful entry. A closely related argument is that even if the emergency exception applies, Fire Marshal Barber exceeded the scope of the exception by entering his apartment through the front door rather than taking the more privacy-preserving and expeditious route through his open window.

### *A. The "Emergency Doctrine"*

The "emergency doctrine" permits warrantless entry of a home when the circumstances call for "immediate entry[] incident to the services and protective functions of the police, as opposed to, or as a complement to, their law enforcement functions." *United States v. Moss*, 963 F.2d 673, 678 (4th Cir. 1992). The doctrine is a species of exigent circumstances, and may be invoked when the person making warrantless entry "had an objectively reasonable belief that an

4

emergency existed that required immediate entry to render assistance or prevent harm to persons or property within." *Id.* at 678; *see also Mincey v. Arizona*, 437 U.S. 385, 392-93 (1978) ("'The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.'" ) (citation omitted). Just as courts should not engage in unreasonable second-guessing of an officer's assessment of the circumstances that they faced when evaluating whether a warrantless arrest was justified by exigent circumstances,[1] they similarly should not unreasonably second-guess a trained responder's assessment that an emergency existed. *Cf. United States v. Gillespie*, 332 F. Supp. 2d 923, 927 (W.D. Va. 2004).

The emergency doctrine is limited by the principle that any search following warrantless entry for emergency reasons "must then be limited by the type of emergency involved. It cannot be used as the occasion for a general voyage of discovery unrelated to the purpose of the entry." *Moss*, 963 F.2d at 678. However, "the police may seize any evidence that is in plain view during the course of their legitimate emergency activities." *Mincey v. Arizona*, 437 U.S. at 393. Thus, in *United States v. Brand*,[2] the Fifth Circuit noted that a warrantless entry to help a drug overdose victim and seizure of contraband in plain view would be lawful, but would not justify the unrelated search of an adjacent room.

### B. Application of the emergency doctrine to the facts of this case

The Court finds that the warrantless entry of Defendant's apartment by Barber and his colleagues was lawful under the emergency doctrine.

Barber is trained in the field of explosives and incendiary devices. He testified that

---

[1] *Figg v. Schroeder*, 312 F.3d 625, 639 (4th Cir. 2002)

[2] 556 F.2d 1312, 1318 (5th Cir. 1977).

5

before entering Defendant's apartment, the strong odor of gasoline fumes, along with the combination of a two to three gallon gas container, electrical appliances, and the likely presence of low-lying gas fumes in Defendant's bedroom created in his view the risk of an explosion—a danger he described as "imminent." He attempted to gain entry into the apartment by knocking, and had to wait about twenty minutes until the resident manager furnished a key. His failure to enter via the window is not inconsistent with an objectively reasonable belief in the existence of an emergency, given the countervailing risks he thereby would have assumed. Further, an "emergency" goes beyond paradigmatic examples of a burning house or a desperately injured person. The functional question is whether Barber reasonably believed that the danger to life and/or property presented under the circumstances would "brook the delay of obtaining a warrant." *Gillespie*, 332 F. Supp. 2d at 927 (quoting *United States v. Tibolt*, 72 F.3d 965, 969 (1st Cir. 1995)). His expert opinion that the mixture of gas fumes and a possible igniting source in Defendant's bedroom created a risk of an explosion—and thus an attendant serious risk to life and property—may not have caused him to knock down the door or enter through the window, but it did support an objectively reasonable belief that the situation was too risky to countenance the delay of obtaining a warrant.

Once inside the apartment, the first action taken was to test the concentration of gas fumes. It was only then that Barber ruled out evacuating the apartment building, and only then that he saw in plain view in the kitchen some of the evidence that Defendant seeks to suppress. Barber's description of that evidence supported the first search warrant, the execution of which in turn led to two subsequent warrants and the discovery of other tangible evidence that Defendant seeks to suppress. However, none of this evidence seized as a result of the warrants is poisonous

6

fruit, given the Court's findings that the initial warrantless entry was lawful and properly "limited [in scope] by the type of emergency involved."[3] *Moss*, 963 F.2d at 678.

The Court therefore DENIES Defendant's motion to suppress in its entirety.

It is so ORDERED.

The Clerk of the Court is directed to send certified copies of this OPINION AND ORDER to all counsel of record.

ENTERED: *[signature]*
U.S. District Judge

Date: May 26, 2006

---

[3] Defendant's argument that his arrest and subsequent statements to the police are unlawful fruit of an illegal entry fails for similar reasons. Defendant has not argued that the Government seeks to introduce any statements made by Defendant after he was placed in custody and requested the assistance of an attorney, in violation of *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).

7